**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

| | | |
|---|---|---|
| **GEORGE A. PARSONS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:07-00784** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Order entered December 4, 2007 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 10 and 13.)

The Plaintiff, George A. Parsons, (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on September 21, 2004 (protective filing date),[1] alleging disability as of January 14, 1999, due to poor eyesight, bad back, and cancer. (Tr. at 56, 57-61, 64-65, 100, 356-57.) The claims were denied initially and upon reconsideration. (Tr. at 26-28, 35-37, 358, 359-61, 364, 365-67.) On October 26, 2005, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at

---

[1] Claimant filed at least six previous applications for benefits, which were denied. (Tr. at 64-67.)

38.) The hearing was held on September 6, 2006, before the Honorable John Murdock. (Tr. at 368-403.) By decision dated February 12, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-22.) The ALJ's decision became the final decision of the Commissioner on October 23, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 4-6.) Claimant filed the present action seeking judicial review of the administrative decision on December 4, 2007, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether

2

the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2004). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of

3

the Listings of Impairments.

> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since January 14, 1999, the alleged onset date. (Tr. at 16, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from degenerative disc disease of the lumbar spine, impaired vision in the left eye, and Non-Hodgkin's Lymphoma, which were severe impairments. (Tr. at 16, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity to perform light level work, involving only occasionally climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. at 18, Finding No. 5.) The ALJ noted that Claimant had limited visual acuity in the left eye. (Id.) At step four, the ALJ found in part on the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, that Claimant was capable of performing past relevant work as a security guard as Claimant actually performed the work and as the work is generally performed in the national economy. (Tr. at 21-22, Finding No. 6.) On this basis, benefits were denied. (Tr. at 22, Finding No. 7.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on September 29, 1956, and was 49 years old at the time of the administrative hearing, September 6, 2006. (Tr. at 57, 356, 373.) Claimant had a ninth grade education. (Tr. at 105, 373-74.) In the past, he worked as a security guard and warehouse worker. (Tr. at 101-02, 390-94, 399-400.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) evaluating Claimant's pain and credibility, (2) disregarding the findings and opinions of Claimant's treating and consulting physicians, and (3) considering the combined effect of Claimant's impairments. (Document No. 10 at 2-13.) The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Document No. 13 at 8-14.)

1. <u>Pain & Credibility</u>.

Claimant argues that the ALJ failed to apply the regulatory factors set forth in SSR 96-7p and 20 C.F.R. § 404.1529, and made a conclusory credibility finding in violation of SSR 96-7p. (Document No. 10 at 4-8.) Claimant asserts that the ALJ failed to cite which evidence he relied on in making his credibility determination, or the reasons for hsi decision. (<u>Id.</u> at 7-8.) Specifically, Claimant alleges that the ALJ ignored the findings of the state agency physicians that Claimant was credible. (<u>Id.</u> at 5; Tr. at 165-72, 242-50.) Though one state agency physician indicated that on inspection, Claimant had no scoliosis, his condition is documented in the medical report from Community Health Systems. (<u>Id.</u> at 5; Tr. at 157-64, 173-88.) Claimant asserts that because he had only a Medicaid card, without additional insurance, he did not have the financial means to secure needed treatment. (<u>Id.</u> at 6.) Consequently, Claimant argues that his allegations of pain and limitations resulting from his back pain are supported by the record and should have been assigned full credibility. (<u>Id.</u>)

The Commissioner asserts that Claimant's argument is without merit because "the ALJ complied with the controlling regulations and Fourth Circuit precedent and supported his findings with substantial evidence." (Document No. 13 at 8-10.) The Commissioner asserts that the ALJ properly found that Claimant's subjective complaints were not entirely credible for the following

reasons:

> 1) Plaintiff was well until July 2004, receiving limited treatment prior to that time; 2) his non-Hodgkin's lymphoma was clinically in remission and showed no signs of recurring; 3) he tolerated that treatment well without significant side-effects, 4) the report of Ms. Reynolds described essentially normal activities of daily living, including fishing, vacuuming floors, washing dishes daily, and cleaning laundry once a week;[3] and 5) the check-off form report of Dr. Shah noted nothing abnormal and the check-off form report of Dr. Arvon noted only reduced range of motion in Plaintiff's neck. (Tr. 19-21, 174, 190, 212, 339, 350).

(Document No. 13 at 9.) For these reasons, the Commissioner contends that the ALJ's pain and credibility assessment is supported by substantial evidence. (Id. at 8-10.)

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2006); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2006). Additionally, the Regulations provide that:

---

[3] In addition to these activities, Plaintiff smoked marijuana twice a week (Tr. 347).

[w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:

> (i) Your daily activities;

> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.

> (iii) Precipitating and aggravating factors;

> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the

individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations.  A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless,  Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical

Case 5:07-cv-00784   Document 15   Filed 02/23/09   Page 11 of 35 PageID #: 467

evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 18.) The ALJ found, at the first step of the analysis, that Claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." (Tr. at 19.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 18-21.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. at 19.)

The Court finds that the ALJ properly considered the factors under 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4), in evaluating Claimant's pain and credibility, despite Claimant's assertion to the contrary. The ALJ summarized Claimant's testimony in his decision and acknowledged Claimant's chemotherapy treatments, which lasted four to six hours and were followed by feelings of fatigue for two or three days thereafter. (Tr. at 18, 378-79.) The ALJ also noted Claimant's testimony that he experienced back pain, had difficulty squatting, and had impaired vision. (Tr. at 18, 375, 389-90.) The ALJ thus noted the nature and location of Claimant's pain, as well as his treatments and at least one resulting physical limitation.

The ALJ also acknowledged Claimant's reported activities of daily living. (Tr. at 20.) He noted Claimant's reports to Ms. Reynolds that he watched television, vacuumed and washed dishes on a daily basis. (Tr. at 20, 350.) He further noted that Claimant fished as a hobby, visited his brother and sister-in-law daily, and reported on a questionnaire that he went outside daily. (Tr. at 20, 133.) On a form Function Report - Adult, dated June 20, 2005, Claimant additionally reported that he shopped for groceries once a month, paid bills, was able to count change, handled a savings account,

11

and used a checkbook or money orders. (Tr. at 133.) However, he indicated that he fished only when he could, which was limited due to his weakness and dizziness. (Tr. at 134.)

The ALJ further considered the medical and opinion evidence of record. (Tr. at 16-21.) The medical evidence revealed that on June 6, 2002, Dr. Rodolfo Gobunsuy, M.D., conducted a consultative medical examination of Claimant regarding his complaints of back pain. (Tr. at 19, 157-64.) Claimant reported that he was told he had two discs out of place and scoliosis, though he had never had a CT scan or MRI of the back. (Tr. at 19, 157.) On physical examination, Dr. Gobunsuy noted that Claimant walked steadily but had a mild limp that favored the left leg. (Tr. at 19, 158.) Claimant was able to walk heel-to-toe tandem, but could neither walk on his heels or toes, nor squat. (Tr. at 19, 159.) He was able to stand steadily on the right leg, but was shaky and unsteady on the left leg. (Id.) Examination of the spine revealed lumbar spine tenderness at L5 to S1, including the left sacroiliac joint, with paralumbar muscle spasm. (Id.) Claimant's range of motion was affected and straight leg raising was positive in the supine position but not in the sitting position. (Id.) On inspection, Dr. Gobunsuy however, found no scoliosis, though a radiology report revealed mild degenerative changes of the lumbar spine with disc space narrowing at L5-S1. (Id.)

A second consultative evaluation was conducted by Dr. Gobunsuy on February 22, 2005, at which time Claimant reported low back pain with radiation and weakness in the legs. (Tr. at 218.) Claimant denied numbness of the legs but admitted that sometimes one or the other leg had given out on him. (Id.) Claimant reported that his low back pain was worsened on bending, lifting, prolonged riding, standing, or walking, and was improved by changing position, lying down, or with pain medication. (Id.) Claimant also reported weakness resulting from chemotherapy treatment. (Id.) On physical exam, Claimant walked slowly and guardedly, and appeared to have difficulty arising from a seated position due to weakness. (Tr. at 219.) The neurological exam revealed no muscle weakness

12

or atrophy, though Claimant was unable to walk on his heels or toes, and could not walk heel-to-toe or squat. (Tr. at 220.) He also could not stand on one leg at a time. (Id.) Examination of the spine revealed tenderness of the lumbar spine on the right side from L4 to the mid-sacral area with paralumbar muscle spasm. (Id.) Range of motion of Claimant's lower back was affected and straight leg raising was limited. (Id.) However, Dr. Gobunsuy noted that Claimant walked steadily and denied numbness in the legs. (Id.) Dr. Gobunsuy opined that Claimant may have had degenerative arthritis of the lumbar spine. (Id.) He could not palpate any lymph node in the neck or in the groin. (Id.)

On February 8, 2005, Claimant underwent a consultative vision examination by Dr. Lewis Gravely, M.D. (Tr. at 16, 216-17.) Claimant reported that the optic nerve of his left eye was damaged at birth and that with the exception of eye glasses, he received no specific eye treatment. (Tr. at 16, 216.) Dr. Gravely reported that Claimant's right eye essentially was normal except for the visual field constriction. (Id.) Examination of the left eye however, was visually unsalvageable. (Id.) Claimant's visual acuity of the right eye with correction was 20/30, while the left eye was hand movement. (Id.)

Claimant was treated by Dr. Matthew Arvon, D.O., from May 30, 2001, through June 14, 2001, for complaints of back pain with radiculopathy resulting frm a work-related injury incurred in 1998. (Tr. at 185-88.) Dr. Arvon prescribed Flexeril and instructed Claimant to adhere to flexibility and strengthening exercises. (Tr. at 186.) Claimant next returned to Dr. Arvon on August 10, 2004, at which time he reported that he had discovered painless knots on his neck four days ago, which all came up at once. (Tr. at 183-85.) Dr. Arvon discussed with Claimant the differential diagnoses to include lymphoma, adenopathy, and leukemia. (Tr. at 16, 182.)

On October 12, 2004, Dr. Arvon completed a Routine Abstract Form - Physical, on which he opined that Claimant's range of neck motion was abnormal due to his diagnosis of follicular Non-Hodgkin's Lymphoma. (Tr. at 16, 173-75.) All other systems were checked as normal. (Tr. at 173-

74.) Dr. Arvon opined that Claimant had a

> 40-60% chance of (In General) "long-term" survival (6-8 yrs) with successful
> treatment. . . Quality of life thereafter depends on the effects that chemo has on his
> body. It is clear that he is currently unable to work in basically any type of job . . .
> and also will require assistance financially due to medical bills.

(Tr. at 16, 175.)

Dr. Arvon referred Claimant to Dr. R. C. Shah, M.D., who performed a biopsy of Claimant's

lymph node on the right posterior triangle of the neck on September 13, 2004. (Tr. at 195-98.) The

pathology report, dated September 20, 2004, revealed follicular lymphoma, grade 2, with marginal

zone differentiation. (Tr. at 199, 201.) This diagnosis was confirmed by the Mayo Clinic on

September 17, 2004. (Tr. at 199, 201, 202-04.) Dr. Shah referred Claimant to Rajiv Khanna, M.D.,

an oncologist, who diagnosed on October 26, 2004, Stage IV-A follicular, Grade II Non-Hodgkin's

Lymphoma, and ordered Rituxan chemotherapy on an inpatient basis. (Tr. at 271-72.) Claimant

reported to Dr. Khanna on October 26, 2004, that he had been well until July, 2004, when he

suddenly noticed the painless cervical lymph nodes and that he had been healthy all his life. (Tr. at

212.) As of December 6, 2004, Claimant had completed eight cycles of Rituxan with good, but partial

response. (Tr. at 266-71.) Dr. Khanna therefore, ordered six cycles of CHOP chemotherapy. (Tr. at

266.) Claimant responded well to CHOP chemotherapy, which was complicated by leukopenia. (Tr.

at 263.) Claimant completed six cycles of CHOP chemotherapy, with clinically good response to

treatment. (Tr. at 256.) Throughout the CHOP treatment, Claimant reported that he felt well. (Tr. at

257-61.) On May 4, 2005, however, Claimant reported that he felt markedly weak, tired, and had no

energy to take even a few steps. (Tr. at 256.) He was experiencing weakness in his hands, but

continued to smoke heavily. (Id.) Dr. Khanna ordered a CT scan of Claimant's neck, chest, abdomen,

and pelvis for restaging. (Id.) The CT scan results revealed persistent and extensive adenopathy in

the retroperitoneum and a continued large six centimeter mass in the left groin area around the femoral artery. (Tr. at 255.) There also was persistent bilateral axillary adenopathy measuring three centimeters, though the cervical adenopathy had improved significantly. (Id.) Dr. Khanna changed Claimant's chemotherapy and started him on Fludarabine and Neulasta. (Id.) He restaged Claimant's condition as Stage IV-B follicular, Non-Hodgkin's Lymphoma. (Id.)

Claimant began the Fludarabine treatments on May 23, 2005, and on June 1, 2005, he reported that with the exception of slight low back pain the day before, he felt well. (Tr. at 254.) He also reported that he was going on vacation the next two weeks. (Id.) Dr. Khanna noted on September 19, 2005, that Claimant was responding well to the Fludarabine and that a CT Scan on August 15, 2005, was stable with no new signs of adenopathy. (Tr. at 253.) Due to vomiting however, Dr. Khanna delayed cycle five of his chemotherapy for one week. (Id.) On October 31, 2005, Claimant reported that he felt well except for low back pain, for which he requested Lortab. (Tr. at 252.) Dr. Khanna prescribed Lortab but advised Claimant that the pain medication would have to stop after chemotherapy was completed. (Id.) Dr. Khanna surmised that the back pain was due to Claimant's treatments, as well as leukopenia and growth factor support. (Id.) Claimant completed six cycles of the Fludarabine treatment and reported on November 16, 2005, that he felt well. (Tr. at 251.) Dr. Khanna noted that Claimant's restaging CT scan conducted on November 15, was "entirely normal," without evidence of adenopathy in the neck, chest, abdomen, or groin. (Id.) Dr. Khanna therefore, opined that Claimant "had a complete response to chemotherapy. At present there is no evidence of active disease." (Id.) He stopped Claimant's chemotherapy, but ordered Rituxan maintenance therapy of one dose every two months. (Id.)

Claimant was started on the Rituxan maintenance therapy on January 11, 2006. (Tr. at 343.) Dr. Khanna noted that Claimant had done very well the past two months since completing the sixth

15

cycle of Fludarabine. (Id.) On February 15, 2006, a CT Scan revealed no evidence of any adenopathy. (Tr. at 339-42.) Claimant reported some continued back pain for which Dr. Arvon placed him on a muscle relaxant, which Claimant reported helped him quite a bit. (Tr. at 339.) Dr. Khanna assessed that Claimant had been in remission for three months and had no evidence of progression or recurrence. (Id.) He ordered that Claimant continue the maintenance Rituxan every two months for one to two years. (Id.) He also assessed acute bronchitis and back pain secondary to disc disease, without evidence of adenopathy. (Id.) A restaging CT scan was performed on July 20, 2006, and on August 7, 2006, Dr. Khanna noted that Claimant's Non-Hodgkin's Lymphoma clinically was in remission with no signs of recurrence. (Tr. at 334-37.) Dr. Khanna continued Claimant on the Rituxan every two to three months. (Tr. at 334.)

In addition to Dr. Arvon's opinion summarized above, the record reveals that Daniel B. McCallum, a state agency reviewing physician, completed a form Residual Functional Capacity Assessment on July 10, 2002, on which he opined that Claimant was capable of performing medium exertional work with postural limitations and a recommendation that he avoid concentrated exposure to heights. (Tr. at 165-72.) In light of the severity of Claimant's symptoms, which Dr. McCallum found were credible, Dr. McCallum reduced Claimant's RFC to medium level work. (Tr. at 170.)

On October 7, 2004, Dr. Shah opined that Claimant, who had been diagnosed with extensive lymphoma, "is believed to be totally disabled. The patient will not be able to return to any gainful employment because of his diagnoses. Patient prognosis is fair to poor." (Tr. at 193.) On October 24, 2004, Dr. Shah completed a form Routine Abstract Form - Physical, on which he checked that Claimant's musculoskeletal, neurological, respiratory, cardiovascular, and digestive systems were normal, meaning that his records showed no problems for the given area. (Tr. at 190-91.) Dr. Shah indicated that the extent of Claimant's vision, hearing, and speech were unknown, meaning that these

areas did not relate to an area within his speciality or treatment of Claimant. (Tr. at 190.) Dr. Shah indicated that Claimant's diagnosis was extensive lymphoma for which he was prescribed Lortab 7-5mg and chemotherapy. (Tr. at 191.)

On March 15, 2005, A. Rafael Gomez, M.D., another state agency reviewing physician, opined that Claimant was capable of performing work at the light exertional level, with occasional postural limitations and an avoidance of temperature extremes, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. at 224-32.) Dr. Gomez concluded that Claimant's symptoms were credible, but that his Non-Hodgkin's Lymphoma was not expected to last twelve months. (Tr. at 229.) He noted that the "modern treatment of lymphoma is for cure. His present condition will not last 12 months." (Tr. at 230.) Rosalind L. Go, M.D., opined on September 7, 2005, that up through December 31, 2003, the date last insured, the "medical evidence is insufficient for assessment." (Tr. at 233-41.)

On September 7, 2005, Dr. Rus L. Go-Lee, M.D., opined that Claimant's Non-Hodgkin's Lymphoma, stage four, and his blindness of the left eye, limited him to performing light exertional work with occasional postural limitations, except that he should never perform activities requiring him to climb ladders, ropes, and scaffolds, or balance. (Tr. at 242-50.) Dr. Go-Lee observed that Claimant had a good response to chemotherapy and that his pains and symptoms generally were credible, and that they would restrict him to performing light work. (Tr. at 247.)

After reviewing the medical and opinion evidence of record, the ALJ acknowledged that Claimant tolerated his chemotherapy treatment well without significant side effects and that his condition remained in remission. (Tr. at 20-21.) Regarding back pain, the ALJ acknowledged Claimant's complaints of pain but noted that Claimant had a minimal history of medical treatment for complaints of back pain until July or August, 2004, when he was diagnosed with Non-Hodgkin's

17

Lymphoma. (Tr. at 20.) Nevertheless, the ALJ gave Claimant the benefit of the doubt and found that he was limited to light exertion through his date last insured. (Tr. at 21.)

Claimant argues that pursuant to SSR 96-7p, the ALJ improperly discredited Claimant's lack of treatment because he did not have the financial means to secure such treatment. SSR 96-7p provides that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." While the Commissioner may not deny a claimant benefits on the basis of a failure to seek treatment due to a lack of funds, see Mickles v. Shalala, 29 F.3d 918, 929-30 (4th Cir. 1994); Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986), the undersigned finds that Claimant has not demonstrated that he sought, and was denied medical treatment due to a lack of funds. The record indicates that Claimant received treatment from Dr. Arvon for his complaints of back pain in 2001. (Tr. at 185-88.) The record is void of further treatment until 2004. As stated above, the ALJ nevertheless credited Claimant's complaints of back pain to the extent that he was limited to performing work at the light exertional level. (Tr. at 21.) Throughout his treatment for Non-Hodgkin's Lymphoma beginning in October, 2004, Dr. Khanna acknowledged his complaints of back pain, prescribed Lortab for pain, and noted that he was being treated by Dr. Arvon with muscle relaxers, which provided great benefit. Accordingly, the undersigned finds that the ALJ did not discredit improperly Claimant's lack of treatment.[4]

---

[4] Though the record contains evidence of Claimant's reports of marijuana use, there is no evidence indicating how Claimant came to possess the marijuana. Accordingly, the undersigned does not find, as the Commissioner argues, that Claimant's possession and use of marijuana supports a finding that Claimant financially was able to secure medical treatment.

The ALJ further found that Claimant tolerated his treatment well and achieved a good response, and thus concluded that Claimant's extreme allegations of disability were not supported by the medical evidence of record. (Tr. at 20-21.) Contrary to Claimant's argument that the ALJ failed to cite which evidence he relied on in making his credibility determination or the reasons for his decision, the undersigned finds that the ALJ thoroughly summarized and evaluated all the evidence in assessing Claimant's pain and credibility.  Though Claimant argues that the ALJ ignored the findings of the state agency physicians that Claimant was credible, the ALJ's decision clearly reveals that he acknowledged the state agency physicians' statements and opinions and reduced Claimant's RFC in accordance with their opinions. The ALJ did not find that Claimant was incredible. Rather, he found that the extent of Claimant's subjective pains, symptoms, and limitations were not supported fully by the record. (Tr. at 19.) The ALJ further considered the opinions of Dr. Shah and Dr. Arvon but determined that the absence of any abnormal findings conflicted with their opinions of disability. (Tr. at 20-21.)

Based on the foregoing, the undersigned finds that the ALJ's pain and credibility assessment complied with the requirements of the Regulations and the applicable case law. The ALJ explicitly set forth the evidence supporting his assessment and explained why he found Claimant to be not entirely credible. The evidence of record indicates, as the ALJ found, that Claimant experienced pain and other symptoms as a consequence of his impairments, but that Claimant's pain and other symptoms were not as debilitating as Claimant contended. The ALJ reduced Claimant's RFC to the performance of light work, which took into account Claimant's pain and symptoms. The ALJ's determination on Claimant's pain and credibility is supported by substantial evidence and Claimant's argument is without merit.

19

2. Opinions.

Claimant next argues that the ALJ improperly rejected in their entirety, the opinions of Dr. Shah, one of Claimant's treating physicians, and Ms. Mareda Reynolds, an examining psychologist. (Document No. 10 at 8-11.) He further argues that the ALJ failed to comply with SSR 96-7p when he discredited Claimant for his failure to obtain medical treatment without first considering the explanation for the lack of treatment. (Id. at 8.) Finally, Claimant contends that pursuant to SSR 96-5p and SSR 85-16, the ALJ should have re-contacted Dr. Shah and Ms. Reynolds, or at the very least have arranged for him to undergo a consultative examination. (Id. at 9-10.)

The Commissioner asserts that the ALJ properly rejected Dr. Shah's opinion of disability because it was unsupported and inconsistent with the record. (Document No. 13 at 10.) Specifically, the Commissioner notes that Claimant's Non-Hodgkin's Lymphoma responded well to treatment and remained in remission. (Id.) Furthermore, Dr. Shah's check-off form failed to note any abnormalities. (Id.) Dr. Shah's examination of Claimant also was unremarkable. (Id. at 11.) Contrary to Dr. Shah's opinion, the treatment notes of Dr. Khanna revealed that Claimant responded to treatment, was in remission, "and that in the midst of chemotherapy, [Claimant] was well enough to go on vacation." (Id. at 10.) Regarding Ms. Reynolds, the Commissioner asserts that the ALJ properly rejected her opinions because they were inconsistent with Claimant's treatment history. (Id. at 11.) Claimant reported that he had neither received mental health treatment, counseling, or therapy, nor been prescribed psychotropic medication. (Id.) Furthermore, as Ms. Reynolds and the ALJ found, Claimant's activities of daily living essentially were normal. (Id.) Despite his impairments, the Commissioner notes that Claimant smoked marijuana twice a week, fished, vacuumed floors, washed dishes daily, and cleaned laundry once a week. (Id.)

Though Claimant asserts that the ALJ should have re-contacted Dr. Shah and Ms. Reynolds,

20

the Commissioner asserts that such action was not required because the "record was sufficiently developed to make an informed decision." (Document No. 13 at 11-12.) The Commissioner further asserts that the ALJ was not required to arrange for a consultative examination because additional evidence was unnecessary for the ALJ to make his decision. (Id. at 12.) Finally, the Commissioner asserts that Claimant's claim that his financial status was insufficient to secure proper medical treatment should be rejected because Claimant had "enough discretionary funds to purchase marijuana twice a week." (Id. at 10, n. 6.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

21

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2006). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)'

22

made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2006). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more

23

consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2006). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

A. *Dr. Shah*.

The medical record reflects Claimant's treatment by Dr. R. C. Shah, M.D., from September 13, 2004, through October 29, 2004. (Tr. at 189-206.) On October 7, 2004, Dr. Shah opined that Claimant, who had been diagnosed with Non-Hodgkin's Lymphoma, "is believed to be totally disabled. The patient will not be able to return to any gainful employment because of his diagnoses. Patient prognosis is fair to poor." (Tr. at 193.) On October 24, 2004, Dr. Shah completed a form Routine Abstract Form - Physical, on which he checked that Claimant's musculoskeletal, neurological, respiratory, cardiovascular, and digestive systems were normal, meaning that his records showed no problems for the given area. (Tr. at 190-91.) Dr. Shah indicated that the extent of Claimant's vision, hearing, and speech were unknown, meaning that these areas did not relate to an area within his speciality or treatment of Claimant. (Tr. at 190.) Dr. Shah indicated that Claimant's diagnosis was extensive lymphoma for which he was prescribed Lortab 7-5mg and chemotherapy. (Tr. at 191.)

The ALJ rejected Dr. Shah's opinion of disability because it was not supported by the treatment records. (Tr. at 20-21.) The ALJ noted that Claimant "tolerated his treatment well and his condition remains in remission." (Tr. at 21.) Furthermore, the ALJ found that Dr. Shah's opinion of disability was inconsistent with his form Routine Abstract Form - Physical, on which he "found nothing abnormal." (Id.) Though the ALJ did not identify specifically which treatment records were inconsistent with Dr. Shah's opinion, the inconsistencies are clear from the ALJ's prior summary of the evidence. Accordingly, in view of the foregoing medical evidence, the undersigned finds that the ALJ's decision to accord no weight to the opinion of Dr. Shah is supported by substantial evidence. For the reasons discussed above, the undersigned further finds that the ALJ did not discredit improperly Claimant's lack of medical treatment.

B. *Ms. Reynolds*.

On September 22, 2006, Claimant underwent a psychological consultative evaluation by Ms. Mareda L. Reynolds, M.A. (Tr. at 345-55.) Claimant reported to Ms. Reynolds that he had never received treatment from mental health professionals, been prescribed psychotropic medication, received counseling or therapy services, or attempted suicide. (Tr. at 346-47.) Claimant also reported that he began smoking marijuana at age eighteen and that he continued to smoke marijuana approximately twice a week. (Tr. at 347.) Regarding his education, Claimant reported that he completed the ninth grade and then quit because he was accused of "things" that he did not do. (Id.) While in school, Claimant stated that he did not receive special education services, though he earned grades of "D's" and "F's." (Id.)

Claimant reported to Ms. Reynolds that he had a history of depression, which began in 1982 following the death of his father. (Tr. at 348.) He related subjective feelings of hopelessness, helplessness, and worthlessness, and exhibited poor self esteem. (Id.) Claimant reported that he was easily irritated, had difficulty making decisions, and easily was fatigued. (Id.) He described his sleep as delayed in onset with frequent awakenings, and further described passive thoughts of suicide without plan or intent. (Id.) Claimant was robbed at gunpoint in 1998, and became paranoid since then. (Id.)

On mental status examination, Ms. Reynolds observed that Claimant's mood was dysphoric, and his affect was constricted mildly but was appropriate to expressed ideas. (Tr. at 348.) Claimant easily established rapport; exhibited spontaneous, coherent, and clear speech, though it was irrelevant at times; and spoke at a normal rate and volume and in complete sentences that easily were understandable. (Id.) Ms. Reynolds opined however, that Claimant's social functioning was mildly deficient based on his interaction during the evaluation. (Id.) Claimant reported that he did not belong

26

to any churches, clubs, or social organizations, and that he visited his brother and sister-in-law daily and his friends once a year. (Tr. at 350.) She further opined that Claimant's insight was fair, his judgment was adequate, his immediate and recent memory was within normal limits, his remote memory was fair, and his attention and concentration were mildly deficient. (Tr. at 348-49.) She noted that Claimant's psychomotor activity was slowed. (Tr. at 349.)

The results of psychological testing on WAIS-III revealed a Verbal IQ of 80, a Performance IQ of 73, and a Full Scale IQ of 75. (Tr. at 349.) Ms. Reynolds opined that these scores were valid and consistent with Claimant's educational and vocational history. (Id.) She noted that during testing, Claimant's rapport, effort, and motivation were sufficient, and that no sensorimotor deficits interfered with his test performance. (Id.) The WRAT-3 scores revealed that Clamant read and spelled at a sixth grade level and performed arithmetic at a fifth grade level. (Tr. at 350.) Ms. Reynolds again determined that these results were valid and consistent with his IQ scores and educational and vocational history. (Id.) The results of the Beck Depression Inventory revealed that Claimant's depression was in the moderate range. (Id.)

Claimant reported his activities of daily living to include drinking coffee and smoking cigarettes, watching television, vacuuming, washing dishes, doing laundry once a week, and using the microwave every other day. (Tr. at 350.) He reported that he fished as a hobby and that he did not perform any lawn care or shopping. (Id.) Ms. Reynolds diagnosed dysthmic disorder, anxiety disorder not otherwise specified, alcohol dependence in remission, personality disorder not otherwise specified with avoidant features, and borderline intellectual functioning. (Tr. at 351.) She assessed a Global Assessment of Functioning[5] of 50. (Id.) Ms. Reynolds opined that Claimant's prognosis was

---

[5] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100.  GAF of 41-50 indicates that the person has serious symptoms,

fair. (Tr. at 352.)

On September 22, 2006, Ms. Reynolds also completed a form Summary Conclusions on which she opined that Claimant's mental impairments resulted in the following moderate limitations: ability to understand, remember, and carry out detailed instructions; and ability to be aware of normal hazards and take appropriate precautions. (Tr. at 353-54.) She further opined that Claimant's mental impairments resulted in the following severe limitations in her ability to: maintain attention for extended periods; maintain regular attendance and be punctual within customary tolerances; work in coordination or proximity to others without being unduly distracted by them; complete a normal work day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently of others. (Id.)

The ALJ accorded no weight to the opinions of Ms. Reynolds because they were not supported by the objective findings of record. (Tr. at 17.) Specifically, the ALJ noted Ms. Reynolds' statements that Claimant neither had received any treatment from mental health professionals, counselors, or therapists, nor been prescribed psychotropic medication. (Id.) The ALJ further found that despite having received low grades while in school, Claimant's IQ of 83 received in the fall of 1968, indicated that Ms. Reynolds' low IQ scores and assessed limitations were "too extreme and inconsistent with the evidence of record." (Id.)

Claimant again argues that pursuant to SSR 96-7p, the ALJ improperly discredited Claimant's

---

or any serious impairment in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

lack of mental health treatment because he did not have the financial means to secure such treatment. As discussed above, Claimant however, has failed to demonstrate that he sought mental health treatment and was denied due to the lack of funds or that any medical provider recommended that he seek mental health treatment. The ALJ ordered the consultative examination that was conducted by Ms. Reynolds based upon Claimant's education, his testimony that he was unable to secure employment because he had difficulty filling out applications and completing the interview, and the absence of school records at that time. (Tr. at 391-97.) Claimant's counsel requested that Ms. Reynolds perform the evaluation, which she completed, and Claimant's attorney submitted Claimant's school records. Thus, the undersigned finds that the ALJ did not discredit improperly Claimant's lack of mental health treatment and properly commented on the absence of any mental health issues prior to Ms. Reynolds' evaluation. Claimant does not make any other specific argument as to why the ALJ erred in discrediting Ms. Reynolds' opinion, and therefore, the undersigned finds that the ALJ's decision to reject Ms. Reynolds' opinion is consistent with the evidence of record.

Claimant however, argues that the ALJ, at the very least, should have re-contacted Dr. Shah and Ms. Reynolds regarding their opinions, or ordered a consultative examination. Title 20, C.F.R. § 404.1512(e) requires the Social Security Administration ("SSA") to re-contact a medical source to obtain additional evidence or to seek clarification of evidence when the evidence received from that source "is inadequate for us to determine whether [the claimant is] disabled." 20 C.F.R. § 404.1512(e) (2006).[6] Specifically, additional evidence or clarification must be sought from the medical source

_____

[6] Title 20, C.F.R. § 404.1512(e) provides:

(e) Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.

"when the report from [the claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." Id. Such additional evidence or clarification may be obtained by the SSA requesting copies of the medical sources' records, obtaining a new or more detailed report from the medical source, or contacting the medical source by telephone. Id. Social Security Ruling 96-5p recapitulates the requirements of § 404.1512(e), and directs the ALJ to "make every reasonable effort to recontact [medical] sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear[.]"

The ALJ did not find any conflicts or ambiguities within either Dr. Shah's or Ms. Reynolds' opinions. Rather, on the basis of the evidence of record as a whole, the ALJ concluded that the opinions expressed by Dr. Shah and Ms. Reynolds were inconsistent with Claimant's positive response to treatment and his remission status, as well as the absence of any mental health issues having been raised by any medical source prior to Ms. Reynolds' evaluation or Claimant's indication

---

(1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily availalbe. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

(2) We may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary findings.

20 C.F.R. § 404.1512(e) (2006).

of mental health problems prior thereto. Accordingly, the undersigned finds that the ALJ's duty to contact Dr. Shah or Ms. Reynolds, whether directly or through counsel, was not triggered. See Jackson v. Barnhart, 368 F.Supp.2d 504, 507-08 (D. S.C. 2005) (finding that the ALJ had no duty to recontact a medical source under 20 C.F.R. § 404.1512(e)(1) when that source's "ultimate conclusion regarding disability was wholly inconsistent with both the objective evidence contained in his treatment records and the records of the other physicians who examined [the claimant]."). To the extent that Dr. Shah's opinion of disability and his Routine Abstract Form - Physical, on which he made no abnormal findings, were inconsistent or ambiguous, neither § 404.1512(e) nor SSR 96-5p obligated the ALJ to re-contact Dr. Shah. See Jarrells v. Barnhart, 2005 WL 1000255, *6 (W.D. Va. Apr. 26, 2005) (holding that the "Commissioner is not required to give treating medical sources a second opportunity to backfill an unsubstantiated disability opinion simply because the ALJ finds it to be unsupported. To do so, in effect, would be tantamount to shifting the burden to the Commissioner to prove non-disability.").

Accordingly, the undersigned finds that the ALJ's decision to accord no weight to the opinions of Dr. Shah and Ms. Reynolds is supported by substantial evidence of record. The undersigned further finds that the ALJ did not discredit improperly Claimant's lack of medical or mental health treatment. Finally, the undersigned finds that the evidence before the ALJ was sufficient, and therefore, he was not required to re-contact either Dr. Shah or Ms. Reynolds, or order further consultative evaluations of Claimant.

3. Combination of Impairments and Hypothetical Questions to VE.

Finally, Claimant argues that the combination of his impairments, "when considered in their entirety, renders him incapable of sustaining gainful employment at the light level, or at any level." (Document No. 10 at 12.) Claimant contends however, that the ALJ failed to consider the combined

31

effect of his physical and mental impairments and to make a particularized finding on the effect of the combination of his impairments. (Id.) Claimant notes that he suffers from degenerative disc disease, a left eye vision impairment, and Non-Hodgkin's Lymphoma. (Id. at 11.) As a result of these conditions, Claimant notes the various physicians' observations that he is unable to walk on his heels and toes, squat, and stand steadily on the left leg; he has a guarded gait and limps; experienced muscle spasms in the lumbar region; had abnormal neck range of motion, mild shortness of breath, chronic back pain, and chronic obstructive pulmonary disease. (Id. at 11-12.) Additionally, he suffered from depression and was assessed with moderate and marked limitations. (Id. at 12.) Claimant therefore contends that the combination of his impairments, "when considered with the opinions and reports of his treating and examining physicians, render him unable to engage in substantial gainful activity at any exertional level for any sustainable period of time." (Id. at 13.)

The Commissioner asserts that Claimant's claim that the ALJ failed to consider his impairments in combination should be rejected because the ALJ considered the combination of Claimant's impairments at steps two, three, and four. (Document No. 13 at 14, n.7.) The Commissioner also notes that Claimant "has failed to establish any additional functional limitations resulting from his impairments in combination." (Id.) The Commissioner further contends that Claimant failed to carry his burden of establishing disability at step four of the sequential analysis. (Id. at 12-14.) The Commissioner notes that the ALJ's decision that Claimant was capable of performing his past relevant work as a security guard was based on the reports of Dr. Khanna, Claimant's activities of daily living, and Dr. Shah's observations of Claimant. (Id. at 13.) Thus, the Commissioner asserts that Claimant's argument is without merit and that substantial evidence supports the ALJ's decision. (Id.)

The Social Security Regulations provide as follows:

32

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523; 416.923 (2006). When there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. Id. The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983.)

The Claimant fails to point to any specific portion of the record or any specific evidence demonstrating that the ALJ failed to consider the severity of his impairments in combination and "fractionalized" the impairments. The ALJ specifically noted the requirements of the Regulations with regard to considering impairments in combination. (Tr. at 15, 17-18.) The ALJ then discussed Claimant's impairments, finding that his degenerative disc disease of the lumbar spine, impaired vision in the left eye, and Non-Hodgkin's Lymphoma, were severe impairments. (Tr. at 16.) The ALJ specifically found, however, that the record did not reflect that Claimant had "an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." (Tr. at 17.) Further, the ALJ considered and accounted for Claimant's various impairments in determining Claimant's residual functional capacity, limiting him to light work, with postural limitations to include only occasional climbing, balancing, stooping, kneeling, crouching, and

33

crawling. (Tr. at 18.) Additionally, the ALJ noted that he had considered all of the evidence of record in making his decision. (Tr. at 14.) In his decision, the ALJ discussed each of Claimant's impairments individually, but concluded that their combined effects were not disabling. The ALJ concluded at step four, based on Claimant's failure to meet his burden, that Claimant was capable of performing his past relevant work as a security guard. Consequently, the ALJ was not required to submit hypothetical questions to the Vocational Expert regarding Claimant's ability to perform other work.

Upon review of the evidence of record and the ALJ's decision, the undersigned finds that the ALJ's consideration of Claimant's impairments is consistent with all applicable standards and Regulations, and his conclusions are supported by substantial evidence. The undersigned further finds that Claimant's arguments therefore, are without merit.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 10.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 13.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such

objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 23, 2009.

R. Clarke VanDervort
United States Magistrate Judge